## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS

1.      I, Bryan Acee, Special Agent of the Federal Bureau of Investigation (FBI), being first duly

sworn, make this affidavit in support of an application under Rule 41 of the Federal Rules of

Criminal Procedure for a warrant to search the following premises (hereinafter referred to as the

"Subject Premises") and persons (hereinafter referred to as the "Target Subjects"):

**Subject Premises**

| | |
|---|---|
| A-1 | 3123 Leo Road SW, unit A, Albuquerque, NM 87105 |
| A-2 | 1435 Atrisco Drive SW, units A and B, Albuquerque, NM  87105 |
| A-3 | 3810 Villa Serena Place SW, Albuquerque, NM 87121 |
| A-4 | 1114 1/2 Sunflower Road SW, Albuquerque, NM 87105 |
| A-5 | 10416 Connemara Drive SW, Albuquerque, NM 87121 |
| A-6 | 1340 Tres Ritos Street SW, Albuquerque, NM 87121 |
| A-7 | 1132 Florida Street SE, unit E, Albuquerque, NM 87108 |
| A-8 | 1322 Vito Romero Road SW, Albuquerque, NM 87105 |
| A-9 | 2901 Euclid Avenue NE, apartment 22-B, Albuquerque, NM 87106 |
| A-10 | 2331 Menaul Boulevard NE, Albuquerque, NM 87107 |
| A-11 | 100 Deputy Dean Miera Drive SW, RHU 2, cell 12, Albuquerque, NM 87151 |
| A-12 | 100 Deputy Dean Miera Drive SW, RHU 2, cell 29, Albuquerque, NM 87151 |
| A-13 | 100 Deputy Dean Miera Drive SW, RHU 2, cell 27, Albuquerque, NM 87151 |
| A-14 | 100 Deputy Dean Miera Drive SW, RHU 2, cell 29, Albuquerque, NM 87151 |
| A-15 | 100 Deputy Dean Miera Drive SW, RHU 2, cell 5, Albuquerque, NM 87151 |

**Target Subjects**

| | |
|---|---|
| Subject 1 | JESSE YOUNG, aka: "LOBO" |
| Subject 2 | THOMAS JARAMILLO, aka: "CASPER" |
| Subject 3 | EDWARD VALLEZ, aka: "DOPEY" |
| Subject 4 | JOSHUA LOZOYA, aka: "GRIEFO" |
| Subject 5 | ACEN VALADEZ, aka: "BOOGIE" |
| Subject 6 | SABRINA ADAMS, aka: "LOVELY LOKKA" |
| Subject 7 | AMANDA CASAUS, aka: "PANDA" |
| Subject 8 | OMAR MANZANILLA, aka: "SAPO" |
| Subject 9 | BERNARD BACA, aka: "MAD DOG" |
| Subject 10 | ERIC HARRISON, aka: "SNOOP" |
| Subject 11 | DAVID CHAVEZ, aka: "WACKY" |
| Subject 12 | MARIO CHAVEZ, aka: LITTLE MAN" |
| Subject 13 | RAYMOND SALAS, aka: "RAY RAY" |
| Subject 14 | ENRIQUE ROYBAL, aka: "SLEEPY" |
| Subject 15 | ERNEST GUERRO, aka: "ERN DOG" |

More detailed descriptions and photographs of the Subject Premises and Target Subjects are contained within "Attachment A," which has been attached hereto and incorporated herein by this reference.

## PURPOSE OF THE AFFIDAVIT

2.      The FBI Albuquerque Division has been engaged in a multiyear investigation of several violent prison and street gangs, to include the Syndicato de Nuevo Mexico (SNM), Sureños, and West Side Locos (WSL).  The instant investigation pertains to an intergang conspiracy between the SNM, Sureños, and WSL to commit murder in aid of racketeering and the distribution of controlled substances within the District of New Mexico, and elsewhere.

3.      This affidavit is submitted in support of <u>15</u> warrants to search the Target Subjects and Subject Premises, which are believed to contain evidence of conspiracies to commit racketeering, violent crimes in aid of racketeering, unlawful firearm possession, and drug distribution - all of which are being investigated by the FBI and Drug Enforcement Administration (DEA). I believe said items constitute evidence of violations of:

   a)  18 U.S.C. § 1962 Racketeer Influenced and Corrupt Organizations Act (RICO);

   b)  18 U.S.C. § 1959 Violent Crime in Aid of Racketeering (VICAR);

   c)  18 U.S.C. § 924(c) possession of a firearm in furtherance of a drug trafficking crime;

   d)  18 U.S.C. § 922(g)(1) being a prohibited person in possession of a firearm or ammunition;

   e)  21 U.S.C. § 841(a) possession with intent to distribute controlled substances;

   f)  21 U.S.C. § 843(b) use of a communication facility in furtherance of drug trafficking;

   g)  21 U.S.C. § 846 conspiracy to distribute controlled substances; and

   h)  21 U.S.C. § 856 maintaining drug involved premises.

4.      The violations listed above shall be referenced as the "Target Offenses" hereinafter.

5.      This affidavit also seeks the Court's permission to allow the FBI and DEA agents executing the search warrants to search the bodies of the Target Subjects for gang tattoos evidencing membership in or association with the SNM, Sureños, WSL, or any other gang, and to photograph those tattoos. I believe such tattoos may constitute a conspiratorial overt act and have utilized such photographic evidence during gang VICAR and RICO jury trials in the past.

6.      I am submitting this affidavit based upon my experience and familiarity with the instant investigation. This affidavit does not set forth all of my knowledge or summarize all of the investigative efforts in the overall investigation; rather, this affidavit sets forth facts that support probable cause to search the requested locations and persons, as well as relevant background information. During my investigation, I have developed information I believe to be reliable from the following sources:

     a)  Information provided by the FBI, DEA, United States Marshals Service (USMS), United States Bureau of Prisons (BOP), United States Probation Office (USPO), New Mexico Corrections Department (NMCD), Arizona Department of Corrections (AZDOC), California Department of Corrections and Rehabilitation (CDCR), Bernalillo County Metropolitan Detention Center (MDC), Cibola County Correctional Center (CCCC), and other law enforcement or corrections officials, including oral and written reports;

     b)  Results of physical and electronic surveillance;

     c)  Information from undercover agents and Confidential Human Sources (CHS for both plural and singular);

     d)  Information derived from consensually recorded conversations;

e) Information provided by cooperating defendants and/or the defense attorneys representing those persons;

f) Information derived from lawfully intercepted wire communications, to include telephone, text, email, and video; and

g) Records from the FBI National Crime Information Center (NCIC), United States District Courts, New Mexico Courts, and the New Mexico Motor Vehicle Division.

7.     Where I refer to conversations herein, they are related in substance and, in-part, based on conversations between fellow agents, task force officers, detectives, intelligence analysts, institutional gang investigators, or CHS that assisted law enforcement. Any observations referenced herein that I did not personally witness were relayed to me in oral and/or written reports by agents of the FBI or other agencies. All figures, times, and calculations set forth herein are approximate. Unless otherwise specified, weights of controlled substances are approximate.

## AFFIANT'S RELEVANT TRAINING AND EXPERIENCE

8.     I have been a law enforcement officer for more than 22 years, serving as a police officer, detective, task force officer and special agent. I have been with the FBI since 2009 and am currently assigned to the Albuquerque Violent Gang Task Force (VGTF). Prior to my assignment to the VGTF, I started the Albuquerque Violent Crime Task Force (VCTF) in 2017 and served as the task force coordinator from 2017-2021.

9.     Over the past 22 years, I have arrested several hundred persons for offenses related to drug distribution, gang crimes, racketeering offences, firearm violations, homicide, armed robbery, carjacking, assault, and other crimes. Through my training and experience, I am familiar with the methods and means used by individuals, drug trafficking organizations (DTOs), and gang/criminal enterprises to purchase, transport, store, and distribute controlled substances. I am also familiar

with how those individuals and organizations conceal the often substantial profits generated from their criminal activities.

10.     I served as the lead FBI case agent in the government's 2010-2014 Continuing Criminal Enterprise Drug Kingpin Act case against the Cartel de Juarez (or Juarez Cartel), which resulted in extensive seizures of controlled substances, currency, firearms, and the indictment of multiple cartel leaders. Several cartel leaders were extradited to the U.S., tried, and convicted. Other cartel leaders are pending extradition to the U.S.

11.     I am the lead case agent in the government's 2015-2022 gang racketeering case against the SNM prison gang, which encompasses substantial drug trafficking activities, firearm-related offenses, and numerous homicides. To date, more than 160 SNM members and associates have been arrested and 11 gang related homicides were charged as federal racketeering murders.

12.     I have qualified, in federal and state court, as an expert witness on drug trafficking, possession with intent to distribute controlled substances, and the Juarez Cartel. I have also qualified in federal court as an expert witness regarding firearms, ammunition, interstate nexus, and firearm possession as it relates to drug trafficking. I am an FBI subject matter expert on the Juarez Cartel and SNM.

13.     I have served as an adjunct professor, law enforcement instructor, and presenter on drug and gang investigations at the California Highway Patrol, Los Angeles Police Department, New Mexico State Police, and Bernalillo County Sheriff's Office academies; as well as at training classes and seminars for the Organized Crime Drug Enforcement Task Force, California Narcotic Officers Association, California Gang Investigators Association, Southern California Outlaw Motorcycle Gang Task Force, International Outlaw Motorcycle Gang Task Force, New Mexico Gang Task Force, New Mexico State University, and University of New Mexico.

## BACKGROUND ALLEGATIONS REGARDING
## GANGS AND DRUG TRAFFICKERS

14.     Based upon my training, experience, and participation in the investigations of the SNM,

Sureños, and WSL, as well as the investigation of other gang/criminal enterprises and DTOs, I am

aware of the following information:

   a)  The SNM is New Mexico's largest prison gang and has bolstered as many as 500

       members in the past. A more detailed description of the SNM is contained in the pages

       that follow.

   b)  The Sureños (Spanish: Southerners) or Sur 13 are groups of affiliated Hispanic gangs

       that pay tribute to the Mexican Mafia (Eme) prison gang[10] while in state and federal

       correctional facilities. The Sureños originated in southern California, and that area

       remains its stronghold, although they maintain a large presence in Arizona, New

       Mexico, and Nevada.

   c)  The WSL is a Hispanic gang in Albuquerque that is estimated to have 200 members

       spread throughout the city.

   d)  Individuals engaged in the type of criminal conduct constituting the Target Offenses

       (RICO, VICAR, use of a firearm in furtherance of a drug trafficking offense, being a

       felon in possession of a firearm or ammunition, conspiracy and distribution of

       controlled substances, use of a communication facility in furtherance of drug

       trafficking, and maintaining drug involved premises) maintain documents, letters and

       records relating to their illegal activities for long periods of time. This documentary

---

[10] The Mexican Mafia, also known as La Eme (Spanish: "M") or The Black Hand, is a highly organized Mexican American prison gang in the United States. California and BOP officials report that the Mexican Mafia is the most powerful gang within the California and U.S. prison systems. Nearly 2,400 California Sureños in the BOP take orders from the Mexican Mafia. Source: FBI National Gang Intelligence Center and U.S. Bureau of Prisons.

evidence is usually secreted in their place of residence, or the residences of family members, friends or associates, in their business locations, or in stash houses. This documentary evidence includes: telephone numbers, address books, travel receipts, notes referencing aliases or coded names, false identification, money order receipts, money orders, money remittance receipts, pre-paid money cards such as, MoneyPak, Wal-Mart, Green Dot, or other debit cards, bulk U.S currency, money collection logs, such as "tally" sheets, drug load sheets, shipping/mailing receipts, detention facility inmate number lists or addresses for inmates or detention facilities.

e) Individuals engaged in the type of criminal conduct constituting the Target Offenses maintain regular contact with one another. This contact does not terminate once an individual is incarcerated. Members of gang/criminal enterprises routinely send and receive letters from other members of the organization in which they discuss ongoing criminal activities and request various forms of assistance, to include financial help and/or witness intimidation or elimination (as is the case in the instant investigation). Incarcerated members of gang/criminal enterprises communicate via telephone calls, some of which are generated via third parties. In addition, incarcerated members often keep photographs of themselves and other members of the gang/criminal enterprise in order to impress or intimidate others.

f) I am aware members of the SNM, Sureños, and WSL aggressively pursue informants, suspected informants, and persons who betray the gang(s). I am aware the SNM, Sureños, and WSL relay such information to one another through covert communications, messages, emails, telephone calls, personal visits, letters, and mail disguised as "legal mail." SNM, Sureños, and WSL members and associates send

controlled substances to inmates disguised as legal mail. The instruments used to create fictitious and fraudulent legal mail include letters, writings, envelopes, stamps, labels, printing devices, or markings used to create such packages.

g) I know that members and associates of gang/criminal enterprises and DTOs have access to numerous cellular phones, often at the same time, in an effort to avoid law enforcement monitoring. I have observed gang members, who are involved in drug trafficking, routinely use pre-paid phones requiring no subscriber information, or fictitious subscriber names, to advance their unlawful activities. These cellular telephones often contain names and phone numbers of other co-conspirators, text messages utilized to further their illicit activities, photographs and videos of gang members, controlled substances, drug proceeds, or firearms. I am aware incarcerated members of gang/criminal enterprises utilize a non-gang member's personal identification number when making prison/jail telephone calls to mask their conversations and decrease the likelihood corrections officers will monitor the call.

h) In addition, I am also familiar with the use of text messaging, instant messaging, and messaging applications, used by gang/criminal enterprises and DTOs to advance their unlawful activities. Members of gang/criminal enterprises and DTOs often use the same strategy to mask their ownership of vehicles, real property, and utility services, in an effort to avoid detection by law enforcement. I am aware NMCD and BOP inmates are able to utilize email services while incarcerated and believe those services are widely used by the inmates.

i) Individuals involved in the distribution of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences

of friends or relatives, and in surrounding areas to which they have ready access, such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement officers executing search warrants at their residences or businesses. I have also observed individuals involved in drug trafficking bury evidence underground in containers on their property.

j)  Members of gang/criminal enterprises and DTOs often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, especially when debts remain open. I have located notes documenting the status of accounts receivable and accounts payable, and the names and phone numbers of suppliers, customers, and co-conspirators, and other associates who have assisted drug traffickers in other ways, such as helping with the cleansing of otherwise "dirty" money. I am aware such proceeds may be made to appear "clean" through a variety of means, including investments into legitimate enterprises and structuring deposits of large amounts of U.S. Currency into financial institutions in such a way so as to avoid the detection by law enforcement, as well as reporting requirements of banking institutions. These records can be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay-owe sheets, drug ledgers, IOUs, miscellaneous notes, money orders, customer lists, and phone address books, both in hard copy or electronic form. I have personally been involved in search warrants which resulted in the discovery of such records that were more than a year old.

k) Individuals involved in gang/criminal enterprises and DTOs possess items of identification, including but not limited to, driver's licenses, rent receipts, bills, and address books. These items may be relevant to the identity of those involved in the criminal enterprise, the possessor of the items seized, and occupants of the premises searched.

l) I am aware that members of the SNM, Sureños, and WSL, use, possess, and conceal bladed and/or blunt weapons; such as knives, shanks, razor blades, metal pipes, metal fittings, edged weapons; and firearms; to include rifles, shotguns, and handguns. These weapons are used and possessed by members of the gang to commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and persons who have betrayed the gang(s), to impose discipline within the gang, and for other violent crimes. I know that firearms are instrumentalities of the crime of drug trafficking and that firearms are critical "tools of the trade" for the gang(s).  Members and associates of the SNM, Sureños, and WSL are expected to possess and maintain weapons and firearms. I am aware members of DTOs often possess firearms to protect their drug supply and proceeds.

15.   The items described above are often stored by members of gang/criminal enterprises and DTOs on their person, in their businesses, residences and surrounding garages, outbuildings, and yards, the residences of friends or relatives, and vehicles.

## OVERVIEW OF THE SNM INVESTIGATION

16.     The FBI, NMCD and United States Attorney's Office (USAO) for the District of New Mexico have been engaged in the investigation of the ultra-violent SNM prison gang for the past seven years. The SNM is New Mexico's largest gang and it has historically controlled the majority of New Mexico's prisons, jails, and Hispanic street gangs. The SNM was formed in the wake of the deadly 1980 Santa Fe prison riot, in which thirty-three inmates were murdered and fourteen correctional officers were taken hostage, beaten, and sexually assaulted. Following the prison riot, the SNM expanded throughout the New Mexico penal system and bolstered hundreds of members. Over the past thirty years, SNM members have murdered four New Mexico police officers.[11]

17.     The investigation into the SNM began in March 2015, when SNM leaders ANTHONY RAY BACA, aka "PUP," ROBERT MARTINEZ, aka "BABY ROB," and ROY MARTINEZ, aka "SHADOW," called for the murder of the cabinet secretary of the NMCD and two high-level supervisors within the NMCD's Security Threat Intelligence Unit (STIU). The threat culminated in late 2015, when ANTHONY RAY BACA directed CHRIS GARCIA, aka: "NERVIOSO," a member on the street, to obtain firearms and murder the NMCD officials or their families. CHRIS GARCIA acquired two firearms and provided a handgun to a second SNM member, an FBI CHS, to be utilized in the murder of the cabinet secretary. A third member of the gang, MANDEL LON PARKER, aka "CHUCO," agreed to assist with the murders, but unbeknownst to him, CHRIS GARCIA instructed the FBI CHS to kill MANDEL PARKER after the "mission" was complete, because CHRIS GARCIA did not trust MANDEL PARKER.

18.     The investigation was further predicated by the fact the SNM had a decades long history

---

[11] Mesilla Marshal's Office Sergeant Thomas Richmond (1988), Albuquerque Police Sergeant Cheryl Tiller (1998), Bernalillo County Deputy James McGrane (2006) and Rio Rancho Police Officer Nigel Benner (2015).

of murder, kidnapping, extortion, drug trafficking, aggravated assault and other violent crimes. The investigation was subsequently designated United States Department of Justice Organized Crime Drug Enforcement Task Force (OCDETF) investigations, titled "Operation Atonement" and "Operation Atonement II."

19.     While the investigation remains active, I am able to attest to the fact the FBI was able to thwart the murder plot directed at the NMCD officials and arrest the conspirators. Moreover, I believe our investigative actions and criminal prosecutions have greatly disrupted the gang's criminal activities. Much of the disruption was accomplished through the implementation of various undercover and advanced investigative techniques, to include:

   a)  110 undercover drug and firearm buys from SNM members/associates;

   b)  77 CHS developed and utilized operationally against the gang;

   c)  9 court-authorized wire intercepts with 11 extension orders, two of which were deployed within the maximum-security prison in Santa Fe, New Mexico;

   d)  11 pen register/trap and trace orders to locate SNM member and VICAR homicide fugitive ANGEL DELEON in Mexico;

   e)  Approximately 455 hours of electronic surveillance recordings of gang meetings and conversations;

   f)  11 homicides solved and charged as RICO or VICAR violations;

   g)  RICO Act conspiracy charges comprised of more than 325 overt acts committed by members of the SNM.

20.     The seven year investigation was segmented into separate phases, which encompassed investigative efforts, 5 separate takedown operations, extensive trial preparation, 5 separate racketeering jury trials, tracking and arresting fugitive SNM member ANGEL DELEON in

Mexico, and the continued proactive monitoring of the gang by law enforcement and corrections officials. A brief overview of the 5 prior phases of the operation follows:

### The Phase I Takedown

21.     In December 2015, 40 SNM members and associates were indicted on federal racketeering, drug, and firearm charges within the District of New Mexico. Shortly thereafter, multiple FBI Special Weapons and Tactics (SWAT) teams deployed around the state and executed 46 federal search warrants. Contemporaneous with the service of the search warrants, 5 NMCD prisons around the state were placed on lock-down and all SNM inmates within the prisons were searched. In addition, 55 SNM members on state parole or probation were contacted and searched by NMCD officers and law enforcement. The prison shakedowns and probation/parole searches yielded additional arrests, interviews, and intelligence information.

22.     In the months that followed the Phase I Takedown, case agents arrested several additional SNM members and associates via criminal complaints for VICAR homicide; firearm violations; tampering with and retaliating against a witness, victim, or an informant; possession with intent to distribute controlled substances; and conspiracy to distribute controlled substances.

### The Phase II Takedown

23.     In April 2016, FBI agents and federal prosecutors presented additional evidence to a federal Grand Jury and obtained 2 supplementary indictments against 39 additional members and associates of the SNM. The 2 indictments incorporated 22 counts of RICO Act conspiracy; VICAR (murder, attempted murder, conspiracy to commit murder, assault with a deadly weapon resulting in serious bodily injury and conspiracy to commit assault with a deadly weapon resulting in serious bodily injury); being a felon in possession of a firearm; using or carrying a firearm during and in relation to a crime of violence; and aiding and abetting. FBI agents arrested dozens of SNM

members and associates during the Phase II takedown.

### The Phase III Takedown

24.     In September 2016, FBI agents served 12 federal search warrants on SNM members believed to be plotting to disrupt the government's investigation by murdering witnesses and informants. Case agents also developed information indicating SNM members had discussed killing FBI agents and federal prosecutors. Select SNM members in the BOP and NMCD prisons were also searched. During the service of the Phase III search warrants, FBI agents seized 12 firearms from residences in Albuquerque and arrested several subjects.

### The Phase IV Takedown

25.     On July 22, 2019, government witness LEROY LUCERO, aka "SMURF," a former leader within the SNM, was murdered in the driveway of his residence in Las Vegas, New Mexico. FBI case agents joined the Las Vegas, NM, Police Department, New Mexico State Police (NMSP), and the San Miguel County District Attorney's Office to investigate the homicide. The Lucero homicide investigation was linked to a DTO being investigated by the DEA. The FBI and DEA case agents combined resources and conducted a joint-investigation.

26.     On September 19, 2019, the FBI and DEA, with assistance from state/local law enforcement, executed 27 federal search warrants and 24 federal arrest warrants in Albuquerque, Santa Fe, Española, Las Vegas, and Wagon Mound, NM. A total of 33 arrests were made and 57 firearms were seized. Substantial leads in the LUCERO homicide were developed as a result of the operation.[12]

---

[12] On July 20, 2022, a Federal Grand Jury in Albuquerque issued a superseding indictment in which ROBERT PADILLA, aka: "FAT HEAD" was charged with VICAR murder, retaliating against a witness, murder in furtherance of drug trafficking, and using a firearm during a drug trafficking crime resulting in death, and witness tampering, and GARY COCA was charged with retaliating against a witness. The charges pertain to the murder of LEROY LUCERO, aka: "SMURF," Case No. 22-CR-00634-JB, Document 34.

**The Phase V Takedown**

27.      In February 2021, case agents learned the SNM intended to monitor the federal courthouse

in Albuquerque during the upcoming VICAR homicide trial of SNM member JODY RUFINO

MARTINEZ, aka: "MONO," in hopes of spotting a specific government witness. Multiple CHS

advised SNM members on the street were to follow the witness from the courthouse and murder

the witness. On March 5, 2021, FBI, USMS, NMSP, Albuquerque Police Department (APD) and

the Bernalillo County Sheriff's Department (BCSO) executed 5 federal search warrants on

members of the SNM to mitigate the threat. Agents arrested 5 SNM members and seized 5

firearms.

28.      To date, more than 160 SNM members and associates have been arrested. The bulk of those

arrested were charged with federal racketeering, drug, or firearm violations.  Although the SNM

is deeply entrenched in the state prison system, 75% of the defendants arrested were out-of-custody

at the time of their arrest. I believe the government's investigative efforts have severely disrupted

the SNM.

## THE SNM, SUREÑOS, AND WSL CRIMINAL ENTERPRISES

29.      I believe the SNM, Sureños, and WSL including their leadership, membership, prospects,

and associates, constitute enterprises as defined in 18 U.S.C. § 1959(b)(2), that is, a group of

individuals associated in fact that engaged in, and the activities of which, affect interstate

commerce. The enterprises constitute ongoing organizations whose members and associates

functioned as continuing units for a common purpose of achieving the objectives of the enterprises.

30.      I am aware that members and associates of the SNM, Sureños, and WSL commit, conspire,

attempt, and threaten to commit acts of violence to protect and expand the enterprise's criminal

operations and reputation. Historically, the SNM, Sureños, and WSL generated income by

distributing controlled substances, extorting weaker drug dealers, and participating in robberies and burglaries. To maintain the criminal enterprises, members of the gang(s) discuss:

a. the membership, rules, and enforcement of the rules;

b. the status of members and associates;

c. the discipline of members;

d. encounters with law enforcement;

e. the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and

f. plans and agreements regarding the commission of future crimes, including murder, assault, robbery, drug distribution, possession of weapons and firearms, as well as ways to conceal these crimes.

**Firearms and Weapons**

31.     With regard to the possession and concealment of weapons and firearms, I am aware members of the SNM, Sureños, and WSL use, possess, and conceal bladed and/or blunt weapons, such as knives, shanks, razor blades, metal pipes, metal fittings, and similar weapons when incarcerated. I am aware NMCD officials and Deputy U.S. Marshals recovered shanks from SNM members, to include within the federal courthouse, during the jury trial phases of the SNM investigation.

32.     Similarly, I know NMCD, MDC, CCCC, and other officers from other correctional facilities have recovered weapons from SNM, Sureños, and WSL members on numerous occasions.

33.     I am aware SNM, Sureños, and WSL members on the street use, possess, and conceal firearms and edged weapons. These weapons are used and possessed by members of the gang to

commit murders, attempted murders, assaults, robberies, to protect illicit drug supplies, to avoid arrest or escape from custody, to intimidate rivals, victims, witnesses, and members or associates who have betrayed the gang(s), or to impose discipline within the gang.

34.     To date, FBI agents have seized more than 120 firearms from SNM members and associates during OCDETF Operations Atonement I and II. Some of the firearms seized were purchased from SNM members during undercover buys. Over the course of the government's investigation, several additional SNM members were charged with being a felon in possession of a firearm or using a firearm in a crime of violence or drug trafficking offense.

35.     While investigating the SNM, I became aware that on at least three occasions, different SNM members solicited other members for firearms. In each of those instances, the SNM members seeking the firearms were convicted felons and articulated a need to obtain a firearm to retaliate against someone or to murder an informant. Case agents were able to utilize undercover FBI agents or CHS to provide the firearms during reverse-undercover operations.[13]

36.     Based on my experiences conducting Sureños investigations in California and New Mexico, I believe the Sureños have a strong affinity for firearms. During two prior investigations of the Sureños activities in New Mexico, FBI agents seized 74 firearms (Operation Brass Monkey) and 27 firearms (Operation Busted and Blue) during separate cases targeting the Sureños.

37.     Over the past few years, members of the FBI VGTF and VCTF have arrested numerous WSL members on firearm related charges, to include felon in possession of a firearm, use of a firearm in a crime of violence or drug trafficking crime, possession of an unlawful firearm, and carjacking. I know WSL members to routinely possess and utilize firearms in the course of their

---

[13] During all three instances, your affiant obtained anticipatory search warrants prior to the sale of the firearm(s) to the intended subjects. Once the firearm(s) were delivered to the target SNM member, an FBI SWAT team surrounded the location and arrested the purchaser. FBI agents never "lost" a firearm, and each time a reverse-undercover operation was employed; the offender was successfully arrested.

illicit activities.

38.     In summation, I believe firearms and weapons are critical "tools of the trade" for the SNM, Sureños, and WSL.

### Gang Alliances, Structure, and Discipline

39.     The SNM has long sought to bring all of the New Mexico-based, Hispanic street gangs under its control, much like the Mexican Mafia prison gang has done with the Sureños. In the 1980's and 1990's the SNM easily dominated New Mexico's prisons and jails. That unrivaled supremacy led to the rise of other prison gangs, such as the Burqueños and Cruces Boys. The Burqueños and Cruces Boys are simply a collection of local Hispanic street gangs from Albuquerque (Burqueños) and Las Cruces (Cruces Boys) that band together when incarcerated for protection from the SNM and other predatory groups.

40.     Members of the SNM and Sureños who are in "bad standing" within the gang are put on a "greenlight" list, which means they are to be assaulted or killed by other members of the gang. If a member is to be killed by the gang, the responsibility often falls on the senior member(s) that sponsored, or brought, that member into the gang. Similarly, if a leader is put on the greenlight list, then the younger members who were brought in by that leader may be asked to take out the leader.

41.     SNM, Sureños, and WSL members are forbidden to cooperate with law enforcement officials and to do so may result in the member's violent death at the hands of his fellow gang members, as was the case on multiple occasions in the SNM investigation.

42.     In summary, I believe the SNM, Sureños, and WSL exist almost exclusively to engage in racketeering activity. Generally speaking, it has been my observation that SNM, Sureños, and WSL generated crimes are not random; members of the aforementioned gangs do not act alone;

SNM, Sureños, and WSL affairs are widespread within the prison/jail system and on the street; and gang members engage in criminal activity for sustained periods of time.

## VIOLENCE TARGETING GOVERNMENT WITNESSES AND AGENTS

43.     Over the course of the SNM investigation, I have become aware of several instances in which members or associates of the SNM have threatened or conducted violent acts aimed at victims, witnesses, case agents, federal prosecutors, and informants (to include suspected informants). Some of the examples of violence targeting victims, witnesses, agents, federal prosecutors, and CHS follow:

    a.   Example 1:  In February 2016, during a recorded telephone call, a CHS, who was a member of the SNM, spoke with SNM member CARLOS HERRERA, aka: "LAZY," and HERRERA's mother, who was a long-time heroin dealer and prior target of Operation Atonement. The CHS attempted to order heroin from CARLOS HERRERA's mother. CARLOS HERRERA and his mother became suspicious of the CHS and subsequently declined to sell heroin to the CHS. A few days later, the CHS was shot several times by a street gang member with family ties to the SNM.  It should be noted the CHS was utilized in the Operation Atonement Phase I takedown operation, which resulted in the arrest of dozens of SNM members and associates.

    b.   Example 2:  In February 2016, SHAUNA GUTIERREZ, the girlfriend of SNM member JOE LAWRENCE GALLEGOS, had SNM member PAUL RIVERA, aka: "OSO," and SNM associates BRANDY RODRIGUEZ, aka: "WEDA," and SANTOS GONZALEZ assault victim J.G. At the time of the assault, J.G had agreed to cooperate with the Valencia County Sheriff's Office in an aggravated battery prosecution against JOE LAWRENCE GALLEGOS. The assailants beat J.G. with clubs and a machete,

and told J.G. the assault was due to the fact J.G. was scheduled to testify against JOE LAWRENCE GALLEGOS. During the attack, J.G. was struck in the head with the machete at least two times and suffered serious bodily injuries.

c. Example 3: In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device, located within a prison facility, talking to other SNM members about killing FBI agents and blowing up a federal building, due to the FBI's investigation of the SNM.

d. Example 4: In March 2016, SNM member CARLOS HERRERA, aka: "LAZY," was overheard on a covert FBI recording device, located within a prison facility, talking to other SNM members about killing informants and anyone else who cooperated with the FBI.

e. Example 5: In March 2016, the brother of a CHS was shot by suspected members of the SNM in Dona Ana, New Mexico, and the family of the CHS reported they were threatened by members of the SNM.

f. Example 6: In April 2016, SNM member ARTURO GARCIA, aka: "SHOTGUN," who had been charged with murder in aid of racketeering and RICO conspiracy, communicated to a cooperating witness, the names of persons who were on the SNM's "green light" list. The list included several employees of the NMCD, various jail staff members, and several cooperating defendants.

g. Example 7: In June 2016, SNM member SAMUEL SILVA, aka: "RABBS", who was facing federal carjacking and firearms charges, solicited a CHS to locate and murder two civilian victims before his federal trial began. SAMUEL SILVA provided the CHS with the names, addresses, and photos of the victims. Prior to requesting the CHS's

assistance, SAMUEL SILVA requested another SNM member to murder his victims; however, that member was arrested on RICO conspiracy charges during the Phase II takedown operation.

h.  Example 8: In July 2016, a cooperating defendant, who was a member of the SNM incarcerated with other SNM members, reported several members were trying to get close to a former SNM leader, who had pled guilty to VICAR charges, so they could murder him.

i.  Example 9: In August 2016, SNM leaders called for a meeting among SNM members (state and federal) on the street, to re-organize the gang and "hit" certain informants and witnesses that were suspected of cooperating with the FBI. The threat was mitigated when the FBI executed 12 federal search warrants on suspected conspirators and recovered 12 firearms during the Phase III takedown operation.

j.  Example 10: In August 2016, correctional officers at the Torrance County Detention Center in Estancia, New Mexico, found three shanks in the SNM pod where several SNM racketeering defendants were being held. Subsequent cooperating defendants, who were in the pod at the time, reported the shanks were to be utilized to hit fellow SNM members who were suspected of cooperating with the FBI.

k.  Example 11: In December 2016, an SNM member who had been charged with murder in aid of racketeering, decided to cooperate and debriefed with the government. The cooperating defendant had been housed with the other SNM defendants in the pending RICO cases and related the SNM wanted to hit, "Acee (Special Agent Bryan Acee) or Armijo (Assistant U.S. Attorney Maria Armijo) because they're the lead agent and prosecutor." The cooperating defendant went on to say, "but anyone on the team would

work" and explained the SNM wanted to hit the government to "get revenge and to demonstrate the power of the SNM."

l.   Example 12: In January 2017, an SNM member who was incarcerated in the NMCD for first degree murder was debriefed by the government. The SNM member was the highest-ranking member of the SNM at the Southern New Mexico Correctional Facility in Las Cruces, New Mexico, at the time. During the interview, the SNM member said the SNM wanted to hit an FBI agent, prosecutor or judge if the opportunity presented itself, due to the RICO prosecution of the gang.

m.   Example 13: In October 2017, an SNM member who had been charged with murder in aid of racketeering, agreed to cooperate with the government. The cooperating defendant, who was in the USMS cell block at the federal courthouse, surrendered 2 shanks to case agents. The cooperating defendant had carried both shanks in his rectum on each prior trip to the courthouse and had sat in the courtroom with them. The cooperating defendant said he had intended to hit a cooperator(s), if given the chance. I am aware at least four other SNM defendants possessed shanks while in the courtroom, because officials subsequently recovered the weapons or those defendants ended up cooperating and admitting such.

n.   Example 14: In July 2018, a government witness who was incarcerated at the PNM North facility received a threatening communication. The witness previously testified as a witness in all three racketeering trials against the SNM. The government witness received a sack lunch with his name and prison cell written on the bag. Inside the bag, the witness discovered a "kite" (a small clandestine note or letter passed from inmate-to-inmate) located between two pieces of sliced cheese. The kite indicated the witness

was a rat and a liar, and threatened the witness and his family. The kite referenced a violent kidnapping and murder that had occurred in Albuquerque, and the author of the kite claimed to have photos of the witness's ex-wife. The author of the kite referenced taking the witness's ex-wife and making her their wife, and included a pornographic image to accompany the threat.

o.  Example 15: In August 2018, an SNM member who had been charged with murder in aid of racketeering, agreed to cooperate with the government and submitted to a debrief. Prior to this, the SNM member had been incarcerated with the other SNM RICO defendants. The SNM member related to the government that SNM leader ARTURO GARCIA, aka: "SHOTGUN," "wants to kill Acee (Special Agent Bryan Acee) or anyone on the prosecution team to make sure he remained good when he entered the feds (BOP)." ARTURO GARCIA boasted to the other inmates he had money and resources on the street to "get things done."

p.  Example 16: On or about January 11, 2019, SNM member DOMINIC SEDILLO, aka: "SICARIO," and an SNM associate shot a former member of the SNM, who had dropped-out of the gang. The shooting took place outside a residence in Albuquerque, New Mexico, and the victim survived, but did not cooperate with police.

q.  Example 17: On February 12, 2019, SNM member CHRISTOPHER CHAVEZ, aka: "CRITTER," was assaulted by SNM members DANIEL SANCHEZ, aka: "DAN DAN," ARTURO GARCIA, aka: "SHOTGUN," and CARLOS HERRERA, aka: "LAZY," at the Otero County Detention Center in Chaparral, New Mexico. I believe the assault was the result of CHRISTOPHER CHAVEZ having submitted a letter to U.S. District Court Judge James O. Browning stating he wanted to renounce the SNM

and would sit down and debrief with the FBI. The letter was uploaded by the court into the online court file and became visible to all of the other SNM racketeering defendants, via their attorneys.

r.   Example 18: On July 22, 2019, at about 11:30 p.m., former SNM leader LEROY LUCERO, aka: "SMURF," was shot and killed in the driveway of his residence in Las Vegas, New Mexico. LEROY LUCERO had testified in pretrial motions hearings and as a government witness during one of the government's lengthy RICO trials. I was present, as the case agent, during the trial and believe LEROY LUCERO's testimony was a significant factor in the conviction of several SNM members.

s.   Example 19: In August 2019, SNM member MARVIN MCALLISTER, aka: "LOONEY," threatened a former SNM member, who testified for the government, and told the former member he (MARVIN MCALLISTER) obtained information "on all the cooperators" from SNM member ARTURO GARCIA, aka: "SHOTGUN." MARVIN MCALLISTER said, "you guys will have a welcoming party when you get there (BOP). Trust me, you guys got it coming." MARVIN MCALLISTER said he had reviewed ARTURO GARCIA's tablet device, which contained all of the discovery material in the RICO cases. MARVIN MCALLISTER told the witness the SNM had written the names of all the cooperators and sent the lists to SNM members in the state and federal prisons. MARVIN MCALLISTER also said the SNM had copies of newspaper clippings, which publicly identified cooperators utilized during the various RICO prosecutions.

t.   Example 20: In November 2020, ROBERT PADILLA, aka: "FAT HEAD," and 5 other CCCC inmates assaulted and stabbed an FBI CHS who had been providing information

to the FBI about the murder of a government witness.

u. <u>Example 21:</u> In June 2022, a government witness was assaulted at the CCCC facility for having previously cooperated with the FBI.

v. <u>Example 22:</u> In July 2022, a government witness was assaulted at the CCCC facility for having previously cooperated with the FBI.

## **THE CONFIDENTIAL HUMAN SOURCES**

44.     During the course of the instant investigation, FBI and DEA agents utilized 22 CHS[14] to infiltrate the Target Subjects and their criminal associates. Agents encouraged the various CHS to maintain contact with the Target Subjects who were engaged in ongoing criminal activity. By doing so, the CHS have exposed themselves to a violent death should their identities become known. I have sought to provide the Court with some of the underlying circumstances and background information I relied upon in determining the information from the various CHS was reliable.

45.     Regarding the veracity of the CHS reporting herein, I am aware that prison gangs kill former members who tell their secrets, which means the gangs themselves appear to consider CHS' accounts to be reliable and accurate enough to silence them. I believe it is important to note CHS-1 thru CHS-15 have extensive experience with the criminal justice system, incarceration, and their respective gangs. The information the various CHS provided on the drug trade and gang subculture is impressive. CHS-1 thru CHS-15 are either SNM or Sureños members (or in a couple instances longtime associates). The SNM and Sureños gangs are restrictive in membership, mutually

---

[14] The FBI utilize the term CHS to describe an informant; however, other agencies may use Confidential Source (CS), Confidential Informant (CI), Confidential Witness (CW), or Source of Information (SOI). I believe the various terms are interchangeable, but for the purposes of this affidavit I have only used only the term CHS. In the overall SNM investigation, agents have utilized 77 CHS operationally against the gang.

exclusive, and require lethality and a lifetime commitment ("blood in, blood out"). In speaking with FBI agents and/or institutional gang officers, the information the CHS provided could be viewed as a statement against interest, as all of the CHS admitted to participating in criminal gang and/or drug activity.

46.     In the paragraphs that follow, I have provided an overview of each CHS, to include:

> a)  their basis of knowledge concerning the criminal conduct;
>
> b)  motivation to assist the FBI;
>
> c)  criminal history;
>
> d)  any compensation received from the government; and
>
> e)  a statement concerning their reliability.

47.     I tried to provide sufficient information to the Court, while balancing the anonymity and safety of the various CHS. All of the SNM and Sureños CHS described herein expressed fear of retaliation and death if their identities became known to the gangs.

48.     **CHS-1** is a Sureños member and spent several years selling drugs for the Sureños in California and New Mexico. I recruited CHS-1 as a source of information a few years ago because CHS-1 was closely affiliated with several gang members and drug distributors that were targets of FBI investigations. CHS-1 aided me in the collection of evidence against members of the Sureños, Aryan Brotherhood, and other criminal enterprises. Information provided by CHS-1 led to the issuance of 10 federal search warrants, the arrest of multiple subjects, and the recovery of firearms, ammunition, U.S. currency and large quantities of controlled substances. CHS-1 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-1 has one prior felony conviction for alien smuggling. CHS-1 does not have any pending charges and has received

$10,000 in financial assistance from the FBI.[15] I consider the information CHS-1 provided to be reliable because much of it was corroborated through law enforcement investigation, physical and electronic surveillance, and similar source reporting. To my knowledge, CHS-1's information has not been found to be false or misleading.

49.     **CHS-2** is an SNM associate. At one time, CHS-2 distributed heroin for the SNM and later utilized SNM members for protection when CHS-2 became a multi-kilogram narcotics dealer. Over the past few years, CHS-2 aided me in the collection of evidence against members and associates of the SNM. Information provided by CHS-2 led to the issuance of at least 22 federal search warrants, the arrest of multiple suspects, and the recovery of firearms, ammunition, U.S. currency and significant quantities of controlled substances. CHS-2 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-2 has prior felony convictions for heroin trafficking, burglary, receiving a stolen vehicle and larceny. CHS-2 does not have any pending charges. CHS-2 has received more than $10,000 in financial assistance from the FBI. I consider the information CHS-2 provided to be reliable because much of it was corroborated through law enforcement investigation, controlled buys, and both physical and electronic surveillance. To my knowledge, CHS-2's information has not been found to be false or misleading.

50.     **CHS-3** is a Sureños member and has sold drugs and firearms and assaulted people for the Sureños in California, New Mexico and elsewhere. CHS-3 has served as a liaison between the Sureños and SNM in state and federal prison, and on the street. I recruited CHS-3 as a source of information several years ago because I was investigating criminal activities perpetrated by the Sureños and Mexican Mafia in New Mexico. CHS-3 aided me in the collection of evidence against members of the Sureños and SNM gangs. CHS-3 has assisted the FBI in New Mexico and

---

[15] Financial assistance includes general payments, moving expenses, and fuel for the CHS's vehicle during operational support to the FBI.

California with gang investigations, and spent several months utilizing a consensually monitored cellular telephone to speak with targets of FBI investigations. CHS-3 has also worn covert recording devices during meetings with gang members and organized crime figures. Information provided by CHS-3 has led to the issuance of 18 federal search warrants, ten state search warrants, the arrest of multiple suspects, and the recovery of controlled substances, firearms, ammunition and U.S. currency. CHS-3 also provided the FBI with information about serial armed robbery crews and persons believed to be transporting firearms to criminal elements in Mexico. CHS-3 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-3 has prior felony convictions for human trafficking, armed robberies, aggravated battery, and drug distribution. CHS-3 does not have any pending charges and has received approximately $4,000 in financial assistance from the FBI. I consider the information CHS-3 provided to be reliable because much of it was corroborated through law enforcement investigation, wire interception, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-3's information has not been found to be false or misleading.

51.     **CHS-4** is a Sureños member and has sold drugs and assaulted people for the Sureños in California, New Mexico, and elsewhere. CHS-4 was contacted by FBI agents in 2022 during a search of CHS-4's residence. CHS-4 was cooperative with agents and voluntarily provided information regarding the Sureños structure in federal prison and on the street in New Mexico. I believe CHS-4 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-4 provided to the FBI could be viewed as a statement against interest, as CHS-4 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-4 has prior felony convictions for being a felon in possession of a firearm, armed robberies,

aggravated fleeing a law enforcement officer, child abuse, and conspiracy to commit a felony. CHS-4 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-4 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-4's information has not been found to be false or misleading.

52.     **CHS-5** is a Sureños member and has sold drugs and assaulted people for the Sureños in California, New Mexico, and elsewhere. CHS-5 was contacted by FBI agents in 2022 and provided information regarding the Sureños structure in federal prison and on the street in New Mexico. I believe CHS-5 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-5 provided to the FBI could be viewed as a statement against interest, as CHS-5 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-5 has prior felony convictions for being a felon in possession of a firearm, aggravated burglary, tampering with evidence, residential burglary, and conspiracy to commit a felony. CHS-5 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-5 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-5's information has not been found to be false or misleading.

53.     **CHS-6** is a Sureños member and has sold drugs and assaulted people for the Sureños in California, New Mexico and elsewhere. CHS-6 was contacted by FBI agents in 2022 and provided information regarding the Sureños structure in federal prison and on the street in New Mexico.  I believe CHS-6 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-6 provided to the FBI

could be viewed as a statement against interest, as CHS-6 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-6 has prior felony convictions for being a felon in possession of a firearm, aggravated assault with a deadly weapon, larceny, and trafficking a controlled substance. CHS-6 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-6 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-6's information has not been found to be false or misleading.

54.     **CHS-7** is an SNM member. CHS-7 has sold drugs and assaulted people for the SNM in New Mexico and elsewhere.  CHS-7 was contacted by FBI agents in 2022 and provided information on the SNM and their relationship with the Sureños. I believe CHS-7 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-7 provided to the FBI could be viewed as a statement against interest, as CHS-7 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-7 has a prior felony conviction for murder. CHS-7 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-7 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-7's information has not been found to be false or misleading.

55.     **CHS-8** is a Sureños member. CHS-8 has sold drugs and firearms, and assaulted people, for the Sureños in California, New Mexico and elsewhere.  CHS-8 was contacted by FBI agents in 2022 and provided information regarding the Sureños structure in federal prison and on the street in New Mexico. I believe CHS-8 is motivated to assist the FBI in order to avoid further law

enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-8 provided to the FBI could be viewed as a statement against interest, as CHS-8 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-8 has prior felony convictions for being a felon in possession of a firearm (x2), armed robbery, child abuse, contributing to the delinquency of a minor, possession of a controlled substance, and trafficking a controlled substance. CHS-8 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-8 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-8's information has not been found to be false or misleading.

56.     **CHS-9** is a Sureños member and has sold drugs and assaulted people for the Sureños in California, New Mexico and elsewhere. CHS-9 was contacted by FBI agents in 2022 and provided information regarding the Sureños structure in federal prison and on the street in New Mexico. I believe CHS-9 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-9 provided to the FBI could be viewed as a statement against interest, as CHS-9 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-9 has prior felony convictions for bank robbery, felon in possession of a firearm, armed robbery, burglary, larceny, possession of a controlled substance, and trafficking a controlled substance. CHS-9 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-9 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-9's information has not been found to be false or misleading.

57.    **CHS-10** is an associate of the SNM and Sureños. CHS-10 has sold drugs with the SNM and Sureños in New Mexico and elsewhere. CHS-10 was contacted by FBI agents in 2022 and provided information regarding the current status of the SNM and Sureños in federal prison and on the street in New Mexico.  I believe CHS-10 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-10 provided to the FBI could be viewed as a statement against interest, as CHS-10 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-10 has prior felony convictions for being a felon in possession of a firearm, burglary, escape, possession of a short barrel shotgun, and possession of stolen money orders. CHS-10 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-10 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-10's information has not been found to be false or misleading.

58.    **CHS-11** is an SNM member. CHS-11 has assaulted people, collected drug debts, and sold drugs and firearms for the SNM in New Mexico. CHS-11 began cooperating with the FBI a few years ago. CHS-11 provided background information about the membership, structure, and customs of the SNM, as well as identified individuals believed to be members or associates of the SNM. CHS-11 wore a covert recording device inside a prison facility on behalf of the FBI to collect valuable evidence. CHS-11 has felony convictions for murder, armed robbery, aggravated battery, burglary, trafficking a controlled substance, and possession of a controlled substance. CHS-11 received approximately $8,950 in financial assistance from the FBI. I found information from CHS-11 to be reliable because much of it was corroborated by independent source information, other law enforcement investigations, controlled drug buys, and physical and

electronic surveillance. To my knowledge, CHS-11's information has not been found to be false or misleading.

59.     **CHS-12** is an SNM member. CHS-12 recently began providing information to the FBI, although I had spoken with CHS-12 a few times over the past few years. During my previous conversations with CHS-12, CHS-12 was polite and respectful but declined to assist the FBI. CHS-12 recently began providing information to the FBI after CHS-12 spoke with other SNM members and learned government witnesses were being targeted for execution. The information CHS-12 provided to the FBI could be viewed as a statement against interest, as CHS-12 attended SNM meetings discussing the gang's reorganization. I believe such meetings constitute an overt act in furtherance of RICO conspiracy. CHS-12 has prior felony convictions for burglary, aggravated battery, aggravated burglary, possession of a controlled substance and being a felon in possession of a firearm. CHS-12 does not have any pending criminal matters and has not received financial assistance from the FBI. I believe CHS-12's information to be reliable, as CHS-12 is taking an enormous personal risk by betraying the SNM and talking to the FBI. To my knowledge, CHS-12's information has not been found to be false or misleading.

60.     **CHS-13** is an SNM member and has assaulted people, collected drug debts, and sold drugs and firearms for the SNM in New Mexico and elsewhere. CHS-13 was contacted by FBI agents in 2022 and provided information on the SNM and Sureños. I believe CHS-13 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-13 provided to the FBI could be viewed as a statement against interest, as CHS-13 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-13 has prior felony convictions for murder, battery upon a peace officer, false imprisonment, tampering with evidence, and criminal

damage to property. CHS-13 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-13 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-13's information has not been found to be false or misleading.

61.     **CHS-14** is an SNM member and has assaulted people, collected drug debts, and sold drugs and firearms for the SNM in New Mexico and elsewhere. CHS-14 was contacted by FBI agents in 2022 and provided information on the SNM and Sureños. I believe CHS-14 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-14 provided to the FBI could be viewed as a statement against interest, as CHS-14 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-14 has prior felony convictions for robbery, aggravated assault, burglary, possession of a controlled substance, trafficking a controlled substance, larceny, auto theft, criminal damage to property, escape, and battery. CHS-14 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-14 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-14's information has not been found to be false or misleading.

62.     **CHS-15** is an SNM member and has assaulted people, collected drug debts, and sold drugs and firearms for the SNM in New Mexico and elsewhere. CHS-15 was contacted by FBI agents in 2022 and provided information on the SNM and Sureños. I believe CHS-15 is motivated to assist the FBI in order to avoid further law enforcement scrutiny, help prevent homicides, and reduce violent crime. The information CHS-15 provided to the FBI could be viewed as a statement against interest, as CHS-15 admitted to participating in criminal gang activity. I believe such activities

constitute overt acts in furtherance of RICO conspiracy. CHS-15 has prior felony convictions for aggravated battery, aggravated fleeing a law enforcement officer, trafficking a controlled substance, auto theft, aggravated assault, and possession of a controlled substance. CHS-15 does not have any pending charges and has not received financial assistance from the FBI. I consider the information CHS-15 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-15's information has not been found to be false or misleading.

63.     **CHS-16** is a WSL associate and has been purchasing bulk quantities of methamphetamine and fentanyl from WSL members for several years. CHS-16 was interviewed in 2022 and provided agents with background information on the WSL and the gang's top drug suppliers. CHS-16 is currently facing state drug trafficking charges and has two prior felony convictions for trafficking a controlled substance. The information CHS-16 provided to the FBI could be viewed as a statement against interest, as CHS-16 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-16 has not received financial assistance from the FBI. I believe CHS-16 is motivated to assist the FBI to avoid further law enforcement scrutiny and potentially receive a positive recommendation regarding CHS-16's pending state charge. CHS-16 previously provided information to MDC STIU investigators that resulted in drug seizures within the facility. I consider the information CHS-16 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-16's information has not been found to be false or misleading.

64.     **CHS-17** is a WSL member and has sold drugs and collected drug debts for the WSL. CHS-17 was contacted by FBI agents in 2022 and provided information on the WSL's criminal activities. I believe CHS-17 is motivated to assist the FBI in order to avoid further law enforcement

scrutiny and receive a positive recommendation in pending felony drug charges. The information CHS-17 provided to the FBI could be viewed as a statement against interest, as CHS-17 admitted to participating in criminal activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-17 has prior felony convictions for possession of a controlled substance and trafficking a controlled substance. CHS-17 has not received financial assistance from the FBI. I consider the information CHS-17 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-17's information has not been found to be false or misleading.

65.    **CHS-18** is a Sureños member and has assaulted people, collected drug debts, and sold drugs and firearms for the Sureños in New Mexico and elsewhere. CHS-18 was contacted by FBI agents in 2022 and provided information on the Sureños, WSL, and drug traffickers in Albuquerque. I believe CHS-18 is motivated to assist the FBI in order to avoid further law enforcement scrutiny and receive a positive recommendation on pending felony drug and firearm charges. The information CHS-18 provided to the FBI could be viewed as a statement against interest, as CHS-18 admitted to participating in criminal gang activity. I believe such activities constitute overt acts in furtherance of RICO conspiracy. CHS-18 has prior felony convictions for trafficking a controlled substance and assault. CHS-18 has not received financial assistance from the FBI. I consider the information CHS-18 provided to be reliable because much of it was corroborated through law enforcement investigation. To my knowledge, CHS-18's information has not been found to be false or misleading.

66.    **CHS-19** is a WSL associate and has been present on numerous occasions when WSL members received and distributed bulk quantities of fentanyl and methamphetamine. CHS-19 was introduced to me via APD homicide detectives as a source of information on the WSL and another

Albuquerque street gang. CHS-19 aided me in the collection of evidence against members of the WSL and another gang. CHS-19 also provided the FBI with information about a gang related homicide. CHS-19 is motivated to assist the FBI to help reduce violent crime and drugs in the community. CHS-19 does not have any prior felony convictions, does not have any pending charges, nor has CHS-19 received financial assistance from the FBI. I consider the information CHS-19 provided to be reliable because much of it was corroborated through law enforcement investigation and physical surveillance. To my knowledge, CHS-19's information has not been found to be false or misleading.

67.    **CHS-20** is a WSL and Sureños associate. CHS-20 obtained drugs from WSL and Sureños members on numerous occasions and provided those gang representatives with information on persons who owed the gang(s) money for drugs. CHS-20 began cooperating with the FBI about 18 months ago. During CHS-20's period of cooperation, CHS-20 participated in several consensually recorded conversations with subjects of FBI investigations and introduced undercover agents to criminal suspects. CHS-20 also utilized a cellular telephone, equipped with wire interception equipment, to converse with FBI investigative targets. CHS-20 has been convicted of drug trafficking and aggravated assault. I consider the information CHS-20 provided to be reliable because much of it was corroborated through independent source information, information obtained from public databases, law enforcement investigations, controlled buys, and physical and electronic surveillance. To my knowledge, CHS-20's information has not been found to be false or misleading.

68.    **CHS-21** is a WSL and Sureños associate. CHS-21 has obtained drugs from WSL and Sureños members on numerous occasions in New Mexico. CHS-21 began cooperating with the DEA several weeks ago. During CHS-21's period of cooperation, CHS-21 provided DEA agents

with background information on several of the Target Subjects, to include details pertaining to the Target Subjects drug distribution operations in the Albuquerque area. CHS-21 also identified other DEA and FBI investigative targets. CHS-21 has been convicted of aggravated burglary and identity theft. DEA agents with whom I have spoken, consider the information CHS-21 provided to be reliable because much of it was corroborated through independent source information, information obtained from public databases, law enforcement investigations, and physical and electronic surveillance. To my knowledge, CHS-21's information has not been found to be false or misleading.

69.    **CHS-22** is a Sureños associate. CHS-22 is familiar with the drug distribution operation run by JESSE YOUNG, aka: LOBO. Information provided by CHS-22 led to the issuance of 2 federal search warrants, the arrest of a DEA investigative target, and the recovery of firearms, ammunition, U.S. currency and large quantities of controlled substances. CHS-22 is motivated to assist the DEA to help reduce violent crime and drugs in the community. CHS-22 does not have any pending charges and has one prior felony conviction for trafficking a controlled substance. CHS-22 has received approximately $5,000 in financial assistance from the DEA. DEA case agents consider the information CHS-22 provided to be reliable because much of it was corroborated through law enforcement investigation, physical and electronic surveillance, and similar source reporting. DEA case agents related to me that they have not observed CHS-22's information to have ever been false or misleading.

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE
## TO SEARCH THE TARGET SUBJECTS AND SUBJECT PREMISES

70.    OCDETF Operations Atonement I and II have significantly disrupted the SNM and created

a void in what was traditionally an SNM stronghold in the state's prisons, jails, and on the streets

of New Mexico. In recent weeks, FBI, BOP, and state and local gang investigators developed

information indicating the Sureños were seeking to capitalize on the void. Intelligence information

from multiple sources indicated the Sureños intended to better organize, direct, and/or broker

fentanyl and methamphetamine sales within the various Hispanic street gangs in the Albuquerque

area. According to CHS reporting, the move by the Sureños was blessed by members of the federal

Eme who have established business relationships with members of the Sinaloa Cartel, who are

housed alongside the federal Eme members.

71.    Source reporting indicated the reorganization of drug and gang activities in New Mexico

is being done with the SNM's acknowledgement, as the SNM fall under the Eme in the federal

prisons. I believe a partnership between the SNM and Sureños enhances intergang operability,

extends the reach of the two enterprises, and allows both gangs new resources and territory to

operate within.

72.    Several of the Target Subjects, to include JESSE YOUNG, aka: "LOBO," THOMAS

JARAMILLO, aka: "CASPER," EDWARD VALLEZ, aka: "DOPEY," OMAR MANZANILLA,

aka: "SAPO," BERNARD BACA, aka: "MAD DOG," ERIC HARRISON, aka: "SNOOP,"

DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: LITTLE MAN," RAYMOND

SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," ERNEST GUERRO, aka:

"ERN DOG," and others, are suspected of conspiring to commit violent crimes in aid of

racketeering. The SNM, with assistance from the Sureños, are seeking to make "examples" of

former SNM members who cooperated with the government in the racketeering prosecution of the

gang. Similarly, SNM members in good standing who fail to assault or kill SNM informants are being targeted for violence by the SNM and Sureños, as I believe was the case in the instant investigation.

73.     Target Subjects JESSE YOUNG, aka: "LOBO," THOMAS JARAMILLO, aka: "CASPER," EDWARD VALLEZ, aka: "DOPEY," JOSHUA LOZOYA, aka: "GRIEFO," ACEN VALADEZ, aka: "BOOGIE," SABRINA ADAMS, aka: "LOVELY LOKKA," AMANDA CASAUS, aka: "PANDA," OMAR MANZANILLA, aka: "SAPO," BERNARD BACA, aka: "MAD DOG," ERIC HARRISON, aka: "SNOOP," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: LITTLE MAN," RAYMOND SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," ERNEST GUERRO, aka: "ERN DOG," and others, are suspected of conspiring to distribute controlled substances in Albuquerque, in part through intergang cooperation. The Target Subjects are also working together to, and with others, to introduce controlled substances and contraband cellular telephones to inmates at MDC, CCCC, NMCD, and other jails and prison facilities.

74.     In the paragraphs that follow, I have outlined the alignment and reorganization of the aforementioned gangs, the conspiracy to commit violent crimes in aid of racketeering, and the various drug distribution schemes the Target Subjects are believed to be involved in.

### Reorganization and Alignment of the SNM Criminal Enterprise

75.     In recent weeks, multiple CHS reported being present when SNM members discussed reorganizing the gang, to include a new set of "reglas" (rules).[16] Based on information provided by CHS-7, CHS-11, CHS-12 CHS-13, CHS-14, and CHS-15, all of whom are members of the SNM, the gang recently implemented the following rules for all members:

---

[16] I believe the new rules were first implemented in 2019; however, they are being recirculated.

Rule 1: "Only fed carnales will call the shots, until further notice;"

Rule 2: "Get RICO discovery out to carnales to see who the rats are;"

Rule 3: "Smash-on-sight any government rat;" and

Rule 4: "Two carnales anytime a carnal talks to staff."

76.    Through my conversations with multiple CHS, who are members of the SNM, combined
with my training and experience investigating gangs, I understand the rules to mean:

77.    Rule 1: *"Only fed carnales will call the shots, until further notice"* – Only SNM members
coming out of the BOP, or currently in the BOP, may make important decisions, such as calling a
greenlight on a person. This is a rule because so many SNM members cooperated with the
government – most of which were from the state system.

78.    Rule 2: *"Get RICO discovery out to carnales to see who the rats are"* – The Court directed
that discovery material in the various SNM RICO cases must not be contained in paper form; rather
it had to be maintained on an electronic tablet. Consequently, all of the RICO defendants had
electronic discovery, which hampered their ability to pass paperwork onto other people.
Documents indicating a person had cooperated with law enforcement are exceedingly important
to prison inmates. I believe SNM associates, and in some cases defense attorneys, have printed
documents in discovery and provided them to SNM members.

79.    Rule 3: *"Smash-on-sight any government rat"* – Kill or seriously assault any former SNM
member who had cooperated with the FBI. Failure to do so will have consequences.

80.    Rule 4: *"Two carnales anytime a carnal talks to staff"* – SNM members must have a
witness with them anytime they speak with prison or jail staff to ensure no one is telling on the
gang.

81.    I believe the SNM has been reorganizing the gang for a couple of years, as much of the

SNM criminal enterprise was disrupted with the large-scale prosecution of the gang. Probably the most disruptive feature of the prosecution, in gang terms, was the fact so many of the SNM's members cooperated with the government.

82.     The investigation into the reorganization of the SNM became a significant priority in late July 2019, when the FBI learned the gang had murdered a government witness and intended to kill others. As such, FBI case agents re-established communications with former and new SNM sources, who were in a position to collect intelligence on the gang. Those sources were queried, questioned and encouraged to meet with SNM members to collect information.

83.     Intelligence collection efforts remain active; however, I am able to report CHS-2, CHS-7, CHS-12, CHS-13, CHS-14, and CHS-15, provided information indicating SNM members ERIC HARRISON, "SNOOPS," BERNARD BACA, aka: "MAD DOG," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: "LITTLE MAN," RAYMOND SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," and ERNEST GUERRO, aka: "ERN DOG," were notifying other SNM members of the new rules that the SNM members needed to follow. Some of the communications occurred during in-person meetings, a few of which the various CHS were present at. I am also aware BOP telephone and email records indicate SNM leaders in the BOP have kept in touch with one another and with SNM members in New Mexico.

84.     Investigative information indicated ERIC HARRISON, "SNOOPS," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: "LITTLE MAN," RAYMOND SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," and ERNEST GUERRO, aka: "ERN DOG," have explained to various SNM members the new reglas had been pushed down from the SNM members in the BOP. ERIC HARRISON, "SNOOPS," BERNARD BACA, aka: "MAD DOG," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: "LITTLE MAN," RAYMOND SALAS,

aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," and ERNEST GUERRO, aka: "ERN DOG," discussed the fact all SNM members needed to be aware of the new reglas, and the rules needed to be put into practice right away. It was explained to several CHS the new rules were necessary because the organization had too many "leaks" and "rats" within.

85.    During meetings that took place in the past few months, ERIC HARRISON, "SNOOPS," BERNARD BACA, aka: "MAD DOG," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: "LITTLE MAN," RAYMOND SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," and ERNEST GUERRO, aka: "ERN DOG," all indicated they had been in touch with SNM members in the BOP, and the new reglas were to be implemented immediately. Moreover, ERIC HARRISON just got out of the feds and had an updated greenlight list.

86.    Information from the various CHS indicated ERIC HARRISON, "SNOOPS," BERNARD BACA, aka: "MAD DOG," DAVID CHAVEZ, aka: "WACKY," MARIO CHAVEZ, aka: "LITTLE MAN," RAYMOND SALAS, aka: "RAY RAY," ENRIQUE ROYBAL, aka: "SLEEPY," and ERNEST GUERRO, aka: "ERN DOG," were in communication with SNM leaders regarding the new rules, to include FRANKIE GALLEGOS, aka: "CUNTE," SAMUEL SILVA, aka: "RABBS," ANTHONY RAY BACA, aka: "PUP," and DANIEL SANCHEZ, aka: "DAN DAN," all of whom are in the BOP.

87.    In August 2022, CHS-3, CHS-4, CHS-5, CHS-6, CHS-8, and CHS-9, all of whom are affiliated with the Sureños gang, reported SNM leaders had been in contact with influential California and federal Sureños members to discuss the status of the SNM cases and who the suspected informants were that would be entering the BOP. The SNM and Sureños leaders agreed to work together to dispose of informants within one another's organizations.

88.    According to numerous CHS within the SNM and Sureños, the SNM continue to

reorganize and expand within the BOP. Sources reported the relationship between the SNM and federal Eme has intensified. During the current investigation, agents located several BOP emails between a known federal Eme member and an SNM associate, who I will refer to as the UNWITTING source.[17] The emails indicate the federal Eme has been in communication with members and associates of the SNM for the past three years, and the two organizations are working together to distribute controlled substances and to further other criminal endeavors.

89.    By way of background, the UNWITTING caught the eye of FBI case agents in 2017, after it was discovered the UNWITTING was in email and telephone communication with several SNM members in the BOP. At the time, FBI agents were attempting to mitigate several threats made by the SNM to hit cooperating defendants, witnesses, victims, informants, agents and federal prosecutors. Case agents addressed those threats, which were reoccurring, in Operation Atonement Phases 3 (2016), 4 (2019), and 5 (2021).

90.    Based on my review of BOP telephone calls, records, and emails over the past three years, I believe the UNWITTING is an information exchange conduit for SNM inmates and other gang members. I am aware state and federal inmates are not able to call one another directly, thus a third-party is utilized to overcome prison telephone restrictions. The same is true in county jails. In the BOP, inmates are allowed to use email services, but cannot email one another directly. Similarly, a third-party can send, forward or relay email messages for inmates. I am aware the UNWITTING is relaying messages between state and federal prisoners, and members of numerous prison and street gangs. Many of the communications appear to be coded; although clear implications exist indicating monetary transactions are being conducted. I believe the UNWITTING has merged telephone calls between gang-inmates, during which criminal matters

---

[17] I am aware the identities of the federal Eme member and the UNWITTING source; however, I have elected to omit their names from this affidavit in order to preserve a related investigation.

have been discussed, to include identifying suspected informants. The UNWITTING has significant knowledge of gang-related events taking place within the BOP, to include murders, and appears to be up to date on the locations of multiple BOP inmates. The tracking of BOP inmates is a relatively simple endeavor, as all one has to do is query the BOP's online inmate tracking application on the BOP's website.

91.     The UNWITTING and SNM member FRANKIE GALLEGOS, aka: "CUNTE," who is an inmate at USP Beaumont, frequently discuss the government's racketeering case against the SNM and the locations of SNM members within the BOP. The UNWITTING and FRANKIE GALLEGOS discussed SAMUEL SILVA, aka: "RABBS," and his pending homicide case within the BOP. I am aware the homicide they reference is that of California Sureños member ABRAHAM ALDANA, aka: "LISTO," which is discussed in more detail in the pages that follow.

92.     In other communications that have taken place over the past three years, the UNWITTING and SNM members discussed the fact that the UNWITTING should continue communicating with the federal Eme member because such communications would increase the individual and collective standing of the SNM members and the gang within the BOP.

93.     The UNWITTING and an SNM member discussed sending drugs to an SNM associate in the USP. In another message, the UNWITTING is instructed to reach out to SNM leader ANTHONY RAY BACA, aka: "PUP," and inform him an individual was killed inside a prison facility. I am unsure the identity of the murder victim or the relevance to the SNM.

94.     The UNWITTING had several communications with the fed Eme leader in which the Eme leader described himself a member of the Mexican Mafia and told the UNWITTING to Google his name so the UNWITTING was aware of who he was. The Eme leader discussed his ability to send money to people on the outside and described the structure of his prison pod. The Eme leader

told the UNWITTING everyone in his pod had to shake his hand in the morning and the Eme leader had several little homies under him.  The email communications between the UNWITTING and the Eme leader indicated they also communicated via telephone and postal letters.

95.    A review of BOP records over the past three years, indicated the UNWITTING also emailed inmates at nearly every other USP in the country and in those emails, the UNWITTING passed messages similar to the ones described above.

96.    Based on the findings from the BOP, I requested NMCD STIU officials query the UNWITTINGS telephone number through their inmate telephone system and learned the UNWITTING had been in contact with a dozen different NMCD inmates in five separate prisons around the State of New Mexico, to include gang members with the Sureños, 18th Street, Brew Town Locos, Barelas, San Jose, Juarez Mara Villa, Los Carnales, Burquenos, and Arizona G-Town (or Grandel) prison gangs.

97.    I made a similar request of gang officers at MDC and CCCC, and learned the UNWITTING has been passing messages to inmates within those facilities, to include some of the Target Subjects.

98.    I believe the UNWITTING is facilitating communications for the SNM and federal Eme and its criminal associates, to include the street gangs that support the SNM and Eme. I am aware many of the UNWITTING's communications are via letter, and I believe those communications may shed light on some of the current criminal schemes being executed by the SNM and Eme.

## SNM Member Kills Sureños Leader for the Mexican Mafia

99.    On September 14, 2018, SNM member SAMUEL SILVA killed his cellmate, ABRAHAM ALDANA, aka: "LISTO," a validated California Sureños gang member from Los Angeles, California. I am aware ABRAHAM ALDANA was serving 27 years on a gang RICO case that

had been investigated by an FBI gang task force in Los Angeles. I understand ABRAHAM ALDANA was a high ranking Sureños member and did not cooperate with the government; however, I believe a member of his inner circle may have cooperated and ALDANA failed to hit the cooperator. As a result of the RICO investigation, California Eme member RAFAEL MUNOZ-GONZALEZ, aka: "CISCO," and sixteen La Puente 13 Sureños were charged with federal racketeering, drug and firearm violations. I understand any gang member who is responsible for bringing heat on an Eme member is severely disciplined, to include death.

100.    I believe SAMUEL SILVA's murder of ABRAHAM ALDANA had been sanctioned by the federal Eme and resulted in a favorable light for SNM. I have spoken with dozens of former BOP inmates from the SNM and Sureños, as well as BOP Special Investigative Services (SIS) gang officers and analysts, and am aware the SNM are on equal footing with the Sureños in the BOP. That is to say, the SNM and Sureños fall under the federal Eme in the BOP.

101.    Numerous CHS have reported SAMUEL SILVA currently "holds the llaves (keys) in the feds for the S," which means SILVA is the SNM's shot-caller or leader within the BOP. SILVA is currently being housed at the BOP ADMAX Florence, Colorado, facility (the most secure federal prison in the U.S.) with SNM leader ANTHONY RAY BACA, aka: "PUP." BACA is serving a life sentence in the BOP after being found guilty of VICAR murder during Operation Atonement I.

### Murder, Conspiracy to Commit Murder, and other VICAR Violations

102.    Based on CHS reporting, I am working with APD homicide detectives to review the murders of two SNM members in Albuquerque in November 2021 and August 2022. SNM member A.A. was killed on November 3, 2021 and SNM member M.M. was killed on August 7, 2022. Information derived from multiple SNM and Sureños sources indicated the two SNM

members had been tasked with a "hit or be hit" directive to locate and kill the SNM cooperators that cooperated with the government during the five prior RICO/VICAR trials. Under the restructured SNM, which is being run from the BOP, state and federal SNM members are to locate and kill the SNM cooperators. The cooperators have been greenlit for several years; however, the only cooperator hit thus far has been LEROY LUCERO, aka: "SMURF," which occurred in 2019.

103.    Sources reported SNM leaders, with backing from the federal Eme, have directed SNM members to smash on sight any cooperator. The SNM requested the Sureños assist with this edict, as the Sureños have significantly more personnel on the street and in custody.

### The Recent SNM Homicides in Albuquerque

104.    On August 7, 2022, federal SNM member M.M. was shot and killed by an unknown assailant(s) in a vacant apartment in Albuquerque. In the days following the homicide, I was contacted by SNM and Sureños sources who told me the word on the street was that the SNM and Sureños had hit M.M. The initial reporting from the different CHS indicated M.M. had been hit because he had been given "the keys to Albuquerque" and failed to hit cooperators. Other reporting indicated M.M. had run up significant drug debts in the BOP and failed to pay the Eme; however, BOP SIS advised M.M. left the BOP in good standing and without any problems.

105.    I am familiar with M.M. and knew him to be a veteran member of the SNM.  M.M. was very vocal in recent years about killing anyone who cooperated against the gang.[18] In recent

---

[18] I am aware that in the summer of 2019, M.M. had been communicating with SNM leaders DANIEL SANCHEZ, aka: "DAN DAN," FRANKIE GALLEGOS, aka "CUNTE," SAMUEL SILVA, aka: "RABBS," and other leaders to clear up his name and establish a position of influence within the gang. On August 26, 2019, M.M. spoke with SANCHEZ via a three-way call. M.M. requested SANCHEZ endorse his (M.M.'s) standing within the gang to another SNM member who was at the Santa Fe County Adult Detention Center (SFCADC) with M.M.  SANCHEZ spoke to the other inmate and told him M.M. was his "perro" (dog) and a good carnal. SANCHEZ and M.M. then discussed the SNM gang. SANCHEZ said a new tabla (leadership panel) had been established and things would be changing for the better. Prior to being sent to the SFCADC, M.M. was housed at MDC in Bernalillo County. On May 19, 2019, STG officers at MDC contacted me and provided me with a photograph of a tattoo on the top of M.M.'s head. STG

months I learned M.M. was selling firearms over social media and had an undercover agent (UCA) establish communications with M.M. in an effort to purchase guns from M.M. (who has two prior federal convictions for firearm violations). The UCA was unsuccessful in purchasing firearms from M.M. because M.M. required the UCA to send a video of the UCA smoking methamphetamine or fentanyl before M.M. would meet the UCA.

106.    As I previously mentioned, M.M. was vocal about killing the former SNM members who had cooperated with the government. In August 2019, M.M. threatened a former SNM member who testified for the government, and told the former member that he (M.M.) had obtained information "on all the cooperators" from SNM member ARTURO GARCIA, aka: "SHOTGUN." M.M. said, "you guys will have a welcoming party when you get there (BOP). Trust me, you guys got it coming." M.M. told the cooperating witness he had reviewed ARTURO GARCIA's tablet device, which contained all of the discovery material in the RICO cases. M.M. told the witness the SNM had written the names of all the cooperators and sent the lists to SNM members in the state and federal prisons. M.M. also said the SNM had copies of newspaper clippings, which publicly identified cooperators utilized during the various RICO prosecutions.

107.    After receiving information from the various CHS concerning the murder of M.M., I contacted APD homicide detectives and learned the following information, in summary: M.M. lived in a four-unit apartment complex and served as a maintenance man and security guard at the complex. Two of the apartment units were vacant. At some point M.M. went into one of the vacant apartments and never departed. M.M.'s girlfriend subsequently found M.M. in the apartment,

---

officers told me they had interviewed M.M. inside the STG office, and M.M. claimed the "S" tattoo on top of his head was the "new S" and only SNM members in good-standing could have the new tattoo. M.M. told STG officer the tattoo had been approved by DANIEL SANCHEZ and FRANKIE GALLEGOS. M.M. told the STG officers he wanted them to be "updated on what's going on" in the SNM. STIU officers at the SFCADC related to me that M.M. told them the same information when he arrived at their facility.